IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONALD FOX, et al.,                              *

Plaintiff,                                        *

v.                                                *          Civil Action No. CCB-20-2085

STATE OF MARYLAND, et al.,                        *

Defendants.                                       *
                                              ***

**MEMORANDUM OPINION**

Self-represented plaintiffs Donald Fox and Bruce Koenig (collectively "plaintiffs"), currently incarcerated at Maryland Correctional Institution-Jessup ("MCI-J"), brought this civil action pursuant to 42 U.S.C. § 1983.  ECF No. 1.  Plaintiffs allege that their requests for prayer books, kosher grape juice, kosher challah bread, kosher matzah, tefillin, tzitis, candles for services and Holy days, food items for Jewish Holy days, and outside guests to assist and to accompany the Jewish prisoners in their religious practice, have unreasonably been denied, violating their rights to freely practice their religion.  *Id.*, p. 4.

On February 16, 2021, defendants State of Maryland, Warden Dayena Corcoran, Chaplain Reginald Bellamy, and Chaplain Rachmiel Tobesman filed a Motion to Dismiss or, in the Alternative, for Summary Judgment.  ECF No. 14.  Plaintiffs were notified of their right to respond. ECF Nos. 16 and 17.  Plaintiffs sought, and were granted, extensions of time, to and including September 1, 2021, to respond to the dispositive motion. ECF Nos. 20, 21, 22, 23. Plaintiffs have not filed an opposition response. A hearing is not necessary.  *See* Local Rule 105.6 (D. Md. 2021).  For the reasons explained below, the defendants' motion, construed as a motion for summary judgment, will be granted.

**Background**

1. **Allegations of the Complaint**

Plaintiffs are both incarcerated at MCI-J and practice Judaism. ECF No. 1. Their requests for prayer books, kosher grape juice, kosher challah bread, kosher matzah, tefillin, tzitis, candles for services and Holy days, food items for Jewish Holy days, and outside guests to assist and to accompany Jewish prisoners in their religion's practices allegedly were denied by MCI-J's Administrative Chaplain Reginald Bellamy. *Id.*, p. 4. All other Department of Public Safety and Correctional Services facilities provided the items requested by plaintiffs. *Id.*, p. 5. Additionally, plaintiffs have been offered shabbat candles, a non-metallic candle holder, and the other items listed above, by the Aleph Institute, a Miami, Florida religious organization. *Id.*, pp. 5-6. Defendants Bellamy and Tobesman have not approved the Aleph Institute to assist plaintiffs, despite their being approved by the United States Bureau of Prisons and the United States military. *Id.*, p. 6.

Koenig has been "scolded" by Bellamy regarding his request for Jewish items. ECF No. 1, p. 4. Bellamy allegedly has instructed Koenig that "when those administrative remedy requests ("ARPs") stop, things will get better." *Id*. He also admonished Koenig that he must pray so that things would improve and Koenig should be more "Christ-like." *Id.*, p. 5.

Plaintiffs allege that other MCI-J inmates have stated that since Bellamy's assignment to MCI-J, Jewish prisoners have not received any of the accommodations they have requested. *Id.* Additionally, plaintiffs allege that unidentified former Chaplain Clerks state that Bellamy has advised them "not to give the Jews anything-they complain too much." *Id*.

In 2018, the MCI-J dietary department offered to provide kosher grape juice, kosher matzah crackers, and kosher challah bread for the study session and for shabbat services. Later, dietary staff told plaintiffs that, "Chaplain Bellamy told us not to give you anything." *Id*.

Plaintiffs claim Defendants Bellamy and Tobesman falsely told the Aleph Institute that they identify and affiliated with the Messianic Jewish sect. ECF *Id.*, p. 6.

Plaintiffs contend that Secretaries for the Department of Public Safety and Correctional Services ("DPSCS"), Director of Religious Services for DPSCS, and Wardens at MCI-J have been made aware of the ongoing violation of prisoners' religious rights since 1999. *Id.*.  Despite this knowledge they have permitted Bellamy and Tobesman to continue to violate plaintiffs' rights. *Id.*

Plaintiffs explain that the use of candles is deeply rooted in the practice of Judaism.  *Id.*, p. 7. In 2017, a new Assistant Warden forbade the use of any candles for any religious service at MCI-J, and instead plastic battery-operated tea lights were distributed for use.  *Id.* Plaintiffs were given a dozen tea lights for their needs.  Other DPSCS facilities provided actual shabbat candles to be used for Jewish, Catholic, Christian, Native American and other services. *Id.*  Additionally, through 2019, other religious groups, including Catholic and Native American, were seen using real candles at MCI-J. *Id.* In late 2018, Tobesman saw the tea lights and allegedly stated that they were "wholly inadequate for use in any Jewish services or celebration." *Id.*, pp. 7-8.  However, no one, including Bellamy or Tobesman, took any action to provide candles that Tobesman or the Aleph Institute would consider adequate for religious services. *Id.*, p. 8.

Plaintiffs explain that the State of Maryland's DPSCS offers a Kosher diet for Jewish inmates who request it.  *Id.*, p. 8.  Unlike other special diets, those who wish to receive a kosher diet must fill out an application that includes the name, address, and phone number of family members, Rabbis, and others who will attest that they "really are Jewish."  *Id.* The application is kept in an unsecured file cabinet in the Dietary Manager's office. *Id.* Additionally, unlike other special diets, those receiving Kosher diets are not allowed to share the contents of their trays with any other inmate, even other Jewish inmates. *Id.*, p. 9.  This prohibition is only imposed on Jewish inmates and, plaintiffs contend, is contrary to basic tenets of Judaism and Jewish life. *Id.*  Additionally, inmates receiving the Kosher diet are prohibited from purchasing any non-Kosher food items from the prison commissary. *Id.*  Plaintiffs explain that Judaism "command[s them] to donate to the needy, to give

gifts, and to trade with others, Jewish or other religions." *Id*. Plaintiffs contend that "restricting our daily lives in such a manner is akin to re-writing Judaism altogether…." *Id*. If an inmate receiving Kosher meals violates these rules regarding sharing items from their tray or purchasing non-Kosher food from the commissary, they may be terminated from participating in the Kosher diet. *Id*.

### 2. **Defendants' Response**

Richard Bellamy has been the Administrative Chaplain at MCI-J since November 1999. ECF No. 14-3, ¶ 1. He is responsible for overseeing the paperwork for seventeen different religious groups and the programming for twelve of those groups, including Judaism. *Id*., ¶ 2. He is not responsible for making policy decisions or any decisions regarding who receives Kosher meals. *Id*. Rachmiel Tobesman is the Administrative Chaplain at Central Maryland Correctional Facility ("CMCF") and is the Rabbinic Advisor for DPSCS. ECF No. 14-4, ¶ 1.

### a. **Kosher Meals**

Defendants explain that when inmates enter the Division of Correction they are asked to complete paperwork regarding their religious affiliation. ECF No. 14-4, ¶ 4. Practitioners of Judaism, which requires a Kosher diet, must request the diet by completing the Religious Diet Application Form. *Id*., ¶ 5. Not all inmates who identify as Jewish request a Kosher diet. *Id*., ¶ 4. Tobesman is responsible for reviewing the applications and interviewing inmates regarding their understanding of Kosher diet rules. *Id*., ¶ 5. Once the inmate is approved for the diet they must sign the Religious Diet Agreement, which provides, among other things, that inmates receiving Kosher meals may not purchase non-Kosher food from the Commissary. *Id*., ¶ 6. Tobesman estimates that 60% of the items sold in the Commissary are Kosher. *Id*.

Tobesman is also responsible for reviewing the Commissary logs for all Kosher-keeping inmates to confirm their purchases do not violate the Religious Diet Agreement. ECF No. 14-4, ¶ 7. If an inmate violates the contract, they are provided verbal counseling for the first offense. Continued

violations may result in additional counselling and may ultimately lead to a year suspension from

participation in the Kosher meal program. *Id.* Fox has purchased non-kosher items at the Commissary

on several occasions, after which he was counselled regarding his purchases and reminded that he can

only purchase Kosher food items while receiving the Kosher diet. *Id.*, ¶ 8.

Policies regarding Kosher meals are codified in the Code of Maryland Regulations and are

consistent throughout DPSCS. ECF No. 14-4, ¶ 11.  Per Department of Corrections ("DOC")

regulations, food items are not allowed to be donated.  ECF No. 14-4, ¶ 13.

Defendants further explain that inmates who are prescribed a medical diet may not participate

in the religious diet program.  *See* COMAR 12.03.02.03G; OPS 140.0002.09C(B); ECF No. 14-4, ¶

9; ECF No 14, Ex 5.  Koenig has reported that he suffers from allergies and food sensitivities and

over the last seven years has been prescribed a medical diet on a number of occasions. ECF No. 14-

4, ¶ 9. In 2012, was permitted to receive medical and kosher diets simultaneously. *Id.*

### b.  Religious Items

DPSCS received a complaint from the Aleph Institute in 2017 claiming plaintiffs were not

provided with prayer books or other items necessary for the practice of their religion.  ECF No. 14-4,

¶ 14; ECF No. 14-8.  The issues were investigated and DOC staff determined that the items were

provided to plaintiffs and all Jewish inmates and were kept in the locker where Jewish inmates stored

religious materials. ECF No. 14-4, ¶ 14.

DPSCS has identified security concerns regarding the use of tefillin.  ECF No. 14-4, ¶ 15.

Tefillin contains long leather straps and is a security risk because it can be used for strangling,

hanging, as a weapon, and as an escape tool. *Id.*

DPSCS has also identified security issues regarding the use of open flame candles, which are

dangerous, can cause property damage, and are often not appropriate in correctional settings. ECF

No. 14-4, ¶¶15, 16.  Whether candles are allowed at a specific institution is left to the discretion of

the Warden as each institution has unique circumstances. *Id*., ¶ 16.  For example, some facilities utilize dormitories, or are attached to hospitals which frequently use oxygen,  and an open flame would be particularly dangerous. *Id*.  Some institutions have a history of property damage caused by flames and find their use too dangerous. *Id*. Where candles are not authorized, battery operated tea lights have been offered as a safe, least restrictive, appropriate alternative to open flame candles. *Id*. Tobesman further explains that battery operated tea lights have been approved by Rabbis for use in both hospitals and institutional settings. *Id*., ¶ 17.  Tobesman denies advising plaintiffs that tea lights were inadequate for Jewish services or celebrations.  *Id*. To the contrary, he believes their use is appropriate within the correctional setting. *Id.*; ECF No. 14-9.

Prior to the COVID-19 pandemic, Jewish volunteers were allowed to visit the facility and participate in religious ceremonies. ECF No. 14-4, ¶ 18. Volunteers from the Aleph Institute, however, are no longer allowed to participate in religious services at all DOC facilities across the state due to a number of reports from inmates and chaplains regarding unacceptable behavior by the Aleph Institute volunteers. *Id*.  Both Tobesman and Bellamy deny ever advising the Aleph Institute that plaintiffs chose to identify with the Messianic Jewish Faith group. ECF No. 14-3, ¶ 12; ECF No. 14-4, ¶ 19.

Tobesman avers that decisions regarding Kosher meals, religious items, and the visitors to assist with religious practices, are designed to implement the least restrictive method possible, while taking into consideration legitimate security concerns.  ECF No. 14-4, ¶ 20.  When considering the allowance of any item sent to a prison facility, each item must be inspected by property staff before it is permitted into the facility. *Id*., ¶ 21.  At all institutions across the state, items deemed to be a security risk or violation of policy are not permitted.  *Id*. Additionally, Tobesman explains that food items must come into the facility through either Food Services or the Commissary and are not allowed to be donated per OPS 140.0002.08B(4)(c). *Id*., ¶ 22.

Tobesman also explains that, under Jewish law, a Jew cannot donate that which he cannot eat. ECF No. 14-4, ¶ 23.   Plaintiffs may only donate Kosher food to those in need and therefore, in Tobesman's opinion, the Kosher contract does not place any additional burdens on plaintiffs not already set forth in Jewish law. *Id*. Additionally, Kosher grape juice and other food items for Jewish ritual purposes are available to be purchased from the Commissary.  *Id*., ¶ 13.

For his part, Bellamy denies ever advising plaintiffs to stop filing ARPs.  ECF No. 14-3, ¶ 9. Bellamy explains that he encourages inmates to come to him directly so that issues can be resolved as they arise but has not instructed any inmate not to file an ARP. *Id*. Bellamy also denies ever instructing plaintiffs to be "more Christ-like' or to violate their religion. *Id*., ¶ 10.  Bellamy offers that he does share with inmates how he faces difficulty but does not advocate that they adhere to his religious tenets. *Id*.

Plaintiff Koenig filed eight ARPs addressing religious issues that he appealed to the Inmate Grievance Office ("IGO").  ECF No. 14-10; ECF No. 14-11. Those grievances raised the following claims:

1.  Case No. 2017-1623 filed by Koenig complaining that non-Kosher food was labelled as Kosher;

2.  Case No. 2017-1919 filed by Koenig claiming Jewish inmates were transferred out of MCI-J in order to "keep numbers low;"

3.  Case No. 2018-0875 filed by Koenig claiming staff substituted non-Kosher food for Kosher food;

4.  Case No. 2018-0876 filed by Koenig alleging he was forced to choose between a Kosher meal and a medically required diet;

5.  Case No. 2018-1496 filed by Koenig alleging he was denied a Kosher meal because the Kosher cabinet could not be located;

6.  Case No. 2018-1972 filed by Koenig claiming that MCI-J did not prepare, serve, or provide accurate portions as part of the Kosher meal program;

7.  Case No. 2018-0433 filed by Koenig alleging he was not allowed to light candles, consume Kosher grape juice, and eat matzah as part of a religious service; and

8.  Case No. 2018-0434 filed by Koenig claiming that dietary staff prepared Kosher trays  in a manner unauthorized by Kosher law.

ECF No. ECF 14-10, ¶ 6; ECF No. 14-11. Plaintiff Fox did not present any religious ARPs to the IGO. *Id.*

## Standard of Review

Defendants filed their Motion as a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court considers only the complaint and any attached documents "integral to the complaint[.]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). To the extent that grounds for dismissal are based solely on the contents of the complaint, the court may dismiss under Rule 12(b)(6) if the complaint does not allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(d), however, requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment when matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the district court on notice of the

reasons why summary judgment is premature, *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). Because of the lack of any such affidavit in the present case, the court will construe defendants' motion as a motion for summary judgment.

Under Federal Rule of Civil Procedure 56, the court shall grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## Analysis

Defendants contend that they are entitled to dismissal or summary judgment in their favor because: they are immune from suit in their official capacity; plaintiffs have failed to exhaust their administrative remedies; defendants are entitled to qualified immunity; plaintiffs have failed to state a claim; plaintiffs have identified no personal involvement in the incidents alleged as to Defendant Corcoran; and defendants did not violate plaintiffs' religious rights. ECF No. 14-1, pp. 10-22.

### A. Exhaustion

Defendants contend that plaintiffs' complaint is subject to dismissal pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e, because the issues raised have not been properly

presented through the administrative remedy procedure. ECF No. 14-1, pp. 11-13. The PLRA

provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this
> title, or any other Federal law, by a prisoner confined in any jail, prison, or other
> correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in

any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations

of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary

program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about

prison life, whether they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*,

286 F. Supp. 2d 523, 528 (D. Md. 2003).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and

does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust

administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones*

*v. Bock*, 549 U.S. 199, 212, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674,

682 (4th Cir. 2005). Nevertheless, a claim that has not been exhausted may not be considered by this

court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory, and a court usually may

not excuse an inmate's failure to exhaust. *See Ross v. Blake*, 578 U.S. 1174, 136 S.Ct. 1850, 1856-57

(2016).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his

administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v.*

*Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that

exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review

process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). But the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Moore*, 517 F.3d at 725.

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any Division of Correction official or employee. Md. Code Ann. (2008 Repl. Vol.), Corr. Servs. ("C.S.") § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. *See* C.S. § 10-206(b).

Inmates housed at an institution operated by DPSCS may avail themselves of the administrative grievance process which is designed for "inmate complaint resolution." *See generally* C.S. §§ 10-201 *et seq.*; Code of Maryland Regulations ("COMAR") 12.07.01.01B(1) (defining "ARP"). If an ARP is filed and denied, the prisoner may appeal the denial within thirty days to the Commissioner of Correction.

If the Commissioner of Correction denies the appeal, the prisoner may file a grievance with the IGO, also within thirty days. C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B. The prisoner must include in the grievance copies of the initial request or administrative remedy, the Warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a

11

hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii).

Here, while Koenig filed several ARPs and appeals to the IGO regarding religious issues, those claims did not concern the issues raised in this complaint. Koenig's ARP/IGO filings concerned allegations as to the preparation, substitution, and portioning of Kosher food, transfer of Jewish inmates, denial of a Kosher meal on one occasion, and his inability to have a medical and Kosher diet simultaneously. The complaint allegations concern lack of access to a number of religious items not referenced in any ARP, lack of approval of visitors from the Aleph Institute, threats to stop using the ARP process and to act more "Christ-like", the different process for acquiring Kosher meals (e.g. the application and "Kosher contract"), and inability to purchase non-Kosher food items from the Commissary. The only religious claim that Koenig arguably exhausted was that he was denied grape juice, matzah, and candles for his religious services. His other ARP/IGO appeals, while related to religion, do not state the claims raised in the complaint. Therefore each of his other claims, asserted in the complaint, have not been properly exhausted through the administrative process, and those claims will be dismissed. Koenig's claim regarding denial of the three religious items noted will be considered.  Because Fox failed to pursue any of the claims presented in the complaint through the administrative process, all of his claims will be dismissed.

### B.  Eleventh Amendment

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. CONST.

amend. XI. Sovereign immunity accords States the dignity that is consistent with their status as

sovereign entities. *Fed. Mar. Comm'n v. S. Carolina State Ports Auth.*, 535 U.S. 743, 760 (2002).[1]

The Eleventh Amendment bars suit in federal court against a State by its own citizens, absent

consent or a valid Congressional abrogation of sovereign immunity. *See Coleman v. Court of Appeals*

*of Maryland*, , 566 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States,

as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Board*

*of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001); *Seminole Tribe of Fla. v.*

*Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal jurisdiction over

suits against unconsenting States was not contemplated by the Constitution when establishing the

judicial power of the United States." (internal quotation marks and citation omitted)); *Pennhurst State*

*School and Hospital v Halderman*, 465 U.S. 89, 100 (1984).

Under Eleventh Amendment jurisprudence, "a suit against a state official in his or her official

capacity is not a suit against the official but rather is a suit against the official's office. As such, it is

no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58,

71 (1989). Therefore, official capacity claims are subject to sovereign immunity under the Eleventh

Amendment. *Kentucky v. Graham*, 473 U.S. 159, 167 (1985); *accord Hafer v. Melo*, 502 U.S. 21, 25

(1991). As the Supreme Court explained in *Graham*, 473 U.S. at 165: "Personal-capacity suits seek

to impose personal liability upon a government official for actions he takes under color of state law.

Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against

an entity of which an officer is an agent.'" (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.,* 436 U.S.

658, 690, n. 55 (1978)) (citations omitted); *see also*, *e.g.*, *Huggins v. Prince George's Cnty.*, 683 F.3d

525, 532 (4th Cir. 2012) (treating suit against individuals in official capacity as suit against county).

---

[1] The Eleventh Amendment did not create sovereign immunity; rather, it preserved the sovereign immunity that the States enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 283-85 (2011).

Therefore, States and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under 42 U.S.C. § 1983. *Will*, 491 U.S. at 71.

Sovereign immunity precludes a private individual not only from suing an unconsenting State in federal court, but also extends to an instrumentality of a State (also referred to as an "arm of the state"), absent waiver or Congressional abrogation. In *Pennhurst State School & Hospital*, 465 U.S. at 101-02, the Court said: "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.*; *see also Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013).

The State of Maryland has waived its sovereign immunity for certain types of cases brought in State courts. *See* Md. Code Ann., State Gov't. Art., § 12–201(a). But, it has not waived its immunity under the Eleventh Amendment to a suit of this kind in federal court. Accordingly, plaintiffs' claims against the State of Maryland are dismissed.

To be sure, there are several exceptions to the Eleventh Amendment bar. *See, e.g., Equity In Athletics, Inc. v. Department of Education*, 639 F.3d 91, 107 n. 13 (4th Cir. 2011) (listing exceptions). For example, the Eleventh Amendment does not prevent private individuals from bringing suit against State officials for prospective injunctive relief or declaratory relief for ongoing violations of federal law. This record, however, does not support any claim of ongoing unconstitutional conduct on the part of corrections personnel. Therefore, each individually named defendant is entitled to dismissal with regard to claims against them in their official capacities.

## C. Warden Corcoran

Koenig's claim against Warden Corcoran, which seeks to hold defendant Corcoran liable in an individual capacity for the action of subordinates, must be dismissed for failure to allege personal participation. In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the

constitutional violation. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). A supervisory official cannot be held liable for the acts of a subordinate unless the supervisor's "indifference or tacit authorization of subordinates' misconduct" can be deemed to have caused the injury to the plaintiff. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). For a supervisor to be found liable for such acts, a plaintiff must prove that (1) the supervisor had actual or constructive knowledge that the subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the subordinate's misconduct; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Id.* (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Here, Koenig has not alleged any personal participation by defendant Corcoran. Conclusory statements do not support a claim for supervisory liability. Plaintiff has not provided facts indicating that Bellamy or Tobesman acted in this instance under the direction of Corcoran. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action does not satisfy Rule 8's basic pleading requirements. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Nor has plaintiff alleged any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (stating that "[g]enerally, a failure to supervise gives rise to § 1983 liability . . . only in those situations in which there is a history of widespread abuse"). Accordingly, plaintiff Koenig's claims against Corcoran are dismissed.

**D.  Religious Claims**

Koenig's remaining claim, that he was denied open flame candles, Kosher grape juice, and matzah is unavailing. It is well established that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). Prison restrictions that affect the free exercise of religion but are related to legitimate penological objectives, however, do not run afoul of the constitution. *See Turner v. Safley*, 482 U.S. 78, 89–91 (1987).

Courts consider the following factors in determining if the restrictions on religious exercise are related to legitimate penological objectives:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

*Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014) (quoting *Lovelace v. Lee*, 472 F.3d 174, 200 (4th Cir. 2006)).

An additional consideration in this case is the standard provided by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),[2] which provides in part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results

---

[2] Plaintiff is not required to plead a claim under RLUIPA for the court to determine that the statute applies to their complaint. A plaintiff is "not required to use any precise or magical words in [his] pleading." *King*, 825 F.3d at 222 (citations omitted); *see also Labram v. Havel*, 43 F.3d 918, 920 (4th Cir. 1995) ("Legal labels characterizing a claim cannot, standing alone, determine whether it fails to meet [the standard for notice pleading under Federal Rule of Civil Procedure 8(a)(2)].").

from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a). RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 710 (2005); *see Holt v. Hobbs*, 574 U.S. 352, 357–58 (2015); *Smith v. Ozmint*, 578 F.3d 246, 250 (4th Cir. 2009); *Lovelace*, 472 F.3d at 186. Enactment of RLUIPA ensured that prisoners were entitled to free exercise rights similar to those enjoyed by individuals who are not incarcerated. *See Cutter*, 544 U.S. at 715–17.

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *Holt*, 574 U.S. at 358; *Smith*, 578 F.3d at 251. To prevail on a RLUIPA claim, the inmate must show that the challenged policy substantially burdens his exercise of his religion. *See* 42 U.S.C. § 2000cc-2(b); *Holt*, 574 U.S. at 361. A substantial burden exists where a regulation "puts substantial pressure on [the plaintiff] to modify [his] behavior." *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 260 (4th Cir. 2019) (quoting *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 556 (4th Cir. 2013)). A prison regulation also imposes a substantial burden when it "forces a person to choose between following the precepts of [his] religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." *Lovelace*, 472 F.3d at 187 (internal quotation marks and citation omitted).

While the plaintiff in a RLUIPA action need not prove that the practice at issue is "required or essential to his [or her] religion," he must at least "demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to [his] religious practice." *Tillman v. Allen*, 187 F.Supp.3d 664, 673 (E.D.Va. 2016) (citations omitted). While RLUIPA does

not define "substantial burden," courts have held that the term has the same meaning as it does in the First Amendment context. *Lovelace*, 472 F.3d at 187. "[C]ourts properly consider whether the inmate retains other means for engaging in the particular religious activity . . . in assessing whether a denial of the inmate's preferred method for engaging in that religious exercise imposes a substantial burden." *Tillman*, 187 F.Supp.3d at 674 (quoting *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D.Va. Mar. 15, 2013)).

As Koenig alleges that each of the requested items is to be used during his religious exercise, the only issue is whether the denial of these items constitutes a substantial burden on his ability to practice his religion. To make that showing, plaintiff must demonstrate that the lack of these items places substantial pressure on him to modify his behavior and violate his beliefs. *Krieger v. Brown*, 496 F. App'x 322, 325 (4th Cir. 2012).  A blanket assertion that a religious item is required is insufficient. At a minimum, a free exercise claim under RLUIPA requires an explanation of why the absence of a specific religious item imposes a substantial burden on religious practice. *See id*. at 326. Plaintiff has not provided any basis for the court to conclude that the denial of the requested items substantially burdens his religious exercise. Moreover, plaintiff was provided tea lights as a substitute for the open flame candles and had access to Kosher grape juice and matzah through the Commissary.

Even if plaintiff could establish that the foregoing denials constituted a substantial burden on his religious practice, defendants have demonstrated compelling government interests for their actions.  Defendants explain that the use of open flame candles is a security risk and that, for security reasons, donations of food are not permitted from non-DPSCS sources. Security in a prison setting is a compelling state interest, and security concerns deserve particular sensitivity.  *Lovelace*, 472 F.3d at 190 (citing *Cutter*, 544 U.S. at 722). Both determinations are the least restrictive means for furthering the government's compelling interest and allowing plaintiff to observe his religion while

18

maintaining the safety and security of the facility, staff, and inmates.  Defendants are entitled to summary judgment on this claim.

### Conclusion

Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, will be granted. Fox's complaint will be dismissed without prejudice for failure to exhaust administrative remedies. The claims against the State of Maryland and Warden Corcoran will be dismissed. Koenig's complaint also will be dismissed without prejudice for failure to exhaust administrative remedies, except as to his claims regarding denial of open flame candles, Kosher grape juice, and matzah. As to those claims, defendants Tobesman and Bellamy are entitled to summary judgment.

A separate Order follows.

___9/14/21_____                          _____/S/_____
Date                                         Catherine C. Blake
                                             United States District Judge